Jeffrey R. Krinsk (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
John J. Nelson (SBN 317598)
jjn@classactionlaw.com
FINKELSTEIN & KRINSK LLP
550 W. C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

Attorneys for Renee Sisk and the putative class

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENEE SISK, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>DR.'S OWN, INC. a Delaware Corporation; and GOOD FEET WORLDWIDE LLC, a Delaware limited liability company,<br><br>      Defendants. | Case No: **'19CV2079 BEN MSB**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>• **VIOLATION OF N.C. GEN. STAT. § 75-1.1;**<br><br>• **VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200**, *et seq.*<br><br>**JURY TRIAL DEMANDED** |

1

Renee Sisk ("Plaintiff"), individually and on behalf of all others similarly situated, based on the investigation of counsel as to the actions and omissions of defendants herein, and by their own individual knowledge as to Plaintiff's own circumstances, hereby complains against defendants Dr.'s Own, Inc. and Good Feet Worldwide LLC (collectively herein "Defendants" or "Good Feet") as follows:

## INTRODUCTION

1.     Good Feet manufactures, advertises, and retails 'arch-supporting orthotics' throughout the United States via its own and its franchisees' retail locations. Good Feet exerts a significant degree of control over its franchisees' by obligating mandatory training for franchise managers and by requiring that the franchisees use Good Feet's sales tactics, marketing schemes, and in-store signage and interior design. Good Feet also runs nationwide advertisements on behalf of, and for the benefit of, its franchisees.

2.     Good Feet advertises its orthotics as capable of treating a variety of ailments and asserts that they are, "[d]esigned to exercise and strengthen the muscles, tendons, and ligaments"[1] by modifying the musculoskeletal structure of the user. Good Feet makes outsized promises regarding the ability of their orthotics to cure what ails prospective customers but fails to disclose that many of its customers will receive no benefit from the orthotics and, still more, fails to disclose that many customers complain that their pain and discomfort has worsened due to use of Good Feet arch supports.

3.     Good Feet deceptively calls its salespersons "Arch Support Specialists[2]." In fact, these purported "Arch Support Specialists" have little to no training in podiatry, anatomy, or other related subjects which would distinguish them as specialists. Customers thus arrive at a store to address specific pain or discomfort

---

[1] https://www.goodfeet.com/products/arch-supports
[2] https://www.goodfeet.com/where-to-purchase

1

expecting that, as Defendants advertise, a specialist or some formally trained equivalent will tend to their needs. Instead, a salesperson, who has been trained by Good Feet to employ high-pressure sales tactics, entices them to purchase a product crudely matched to the shape of their foot and at an exorbitant price.

4.    Non-customized arch supports generally cost less than $100.00 while Good Feet's 'orthotic systems' are sold for nearly $1,000.00 to despairing customers who are told that they will see results only after several weeks of using the orthotics. However, should they see no results or even adverse results, customers are unable to return the product, only to exchange it for another ineffective and potentially dangerous Good Feet product. Good Feet will occasionally authorize a partial refund conditioned upon the disaffected customer signing a non-disclosure agreement.

5.    Indeed, consumer reviews of Good Feet are replete with angry customers who feel deceived, many of whom also complain about serious harm caused by the Good Feet orthotic system. Many of these customers believe they were misled by Defendants into believing that Good Feet orthotics have qualities that do not exist. These customers also believe that they are not properly informed that the system often produces no discernible improvements to their condition and may also cause them serious harm.

6.    Good Feet attempts to eat its cake and have it too by, on one hand, making dramatic claims about the salutary effects of the orthotics while, on the other, slyly disclaiming any association with medical care. Good Feet reinforces its claims that its products have health benefits with the use of anatomical graphics to suggest that medical and scientific data supports a positive outcome while touting its 'Arch Support Specialists' who are trained almost exclusively in closing sales. Good Feet disclaims that it is a medical provider but states, unequivocally, that, "Good Feet arch supports are designed to offer pain relief" for ailments ranging from arthritis to metatarsalgia.[3]

---

[3] https://www.goodfeet.com/pain-relief/foot-pain

7.      These representations are intended to entice consumers to visit a Good Feet store where trained salespersons apply high-pressure sales tactics to sell customers invariably ineffective inserts at exorbitant prices. Consumers are then pressured to purchase a three-piece set of orthotics that cost almost $1,000.00 per system, or more. Good Feet encourages financially strapped customers to open a line of credit with CareCredit, a credit provider, that charges as high as 26.99% interest. Good Feet and CareCredit, of course, have an arrangement[4] by which Good Feet is financially rewarded each time a desperate customer opens a CareCredit account.

8.      Good Feet orthotics are mass-produced, off-the-shelf arch supports despite Good Feet advertising that their products will be personally fit to the wearer's needs, that "no two feet are alike," or that customers will receive a "personalized fit." Such representations suggest that each orthotic system is customized for a user's specific medical requirement or other particular needs. Good Feet also has its franchisees use in-store signage, originating from Good Feet's headquarters, which assures customers that the orthotics are "Custom-Fit for Comfort." The result is that misled consumers believe that Good Feet orthotics are a medical panacea crafted to suit their body and their needs and not a mass-produced off-the-shelf product.

9.      Good Feet's deceptive marketing and sales tactics harm both consumers and honest competitors. No benefit to consumers, or the market as a whole, is generally realized by Good Feet's activities. Benefits inure to Good Feet alone as the misinformation it propagates increases traffic to its stores and thus increases sales and revenue. The information discrepancy between what Good Feet advertises it sells and what consumers actually experience, unnecessarily harms a desperate and vulnerable population of consumers.

10.     Defendants' activities violate the North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") and California's Unfair Competition Law ("UCL")

---

[4] https://www.carecredit.com/newsletter/2018/winter/foot-problems/

as Defendants leave a trail of unsatisfied consumers that are members of the Class. Plaintiff and the Class thus seek actual damages, restitution, and/or disgorgement as well as injunctive or other equitable relief available in this circumstance.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§1332(d), 1446, and 1453(b). Plaintiff alleges that Plaintiff and Class members are citizens of different states as Defendant, and the cumulative amount in controversy for Plaintiff and the Class exceeds $5 million, exclusive of interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants reside in this District, many of the acts and transactions giving rise to the violations of law complained of herein occur in this District, and because Defendants:

(a) conduct(s) business itself or through agent(s) in this district, by advertising, marketing, distributing and/or manufacturing its Good Feet orthotics in this District; and/or

(b) is licensed or registered in this District; and/or

(c) otherwise has sufficient contacts with this District to justify Defendant being fairly brought into court in this District, without attending traditional requirement of due process.

## PARTIES

13. Plaintiff Renee Sisk ("Sisk" or "Plaintiff") is, and at all times relevant hereto was, a citizen of New Jersey. Plaintiff Sisk was exposed to Good Feet marketing materials and, believing in the content therein, visited a Good Feet store in North Carolina where she purchased a Good Feet orthotic system for $965.00. Within two weeks, Ms. Sisk was directed by her physician to stop using the Good Feet orthotics entirely, or risk permanent injury.

14. Defendant Dr.'s Own, Inc. ("Dr.'s Own") is a Delaware corporation with its principal place of business located at 5923 Farnsworth Court in Carlsbad,

1  California. Dr.'s Own is a manufacturer, distributor, and retailer of orthotics, directing
2  and managing its business activities from Carlsbad California.

3      15.    Defendant Good Feet Worldwide LLC ("Good Feet Worldwide" or
4  collectively with Dr.'s Own "Good Feet" or "Defendants") is a Delaware company
5  with its principal place of business located at 5923 Farnsworth Court in Carlsbad,
6  California. Good Feet Worldwide is a franchisor soliciting franchises and operating
7  retail stores which sell Good Feet brand orthotics. Good Feet also creates and
8  disseminates marketing material from its California headquarters on behalf of its own
9  and its franchisee's retail stores.

## SUBSTANTIVE ALLEGATIONS

### A. Good Feet is Engaged in Unfair and Deceptive Commercial Practices

12      Good Feet employs unfair and deceptive commercial practices that violate the
13  public policies (and laws) of the state of North Carolina and of the state of California
14  which are intended to promote efficient and competitive markets that protect
15  consumers from inequitable commercial practices. Good Feet's unfair and deceptive
16  commercial activities are not reasonably avoidable to the average consumer and
17  exploits consumers, compromises competitors, and/or distorts the market by chilling
18  legitimate business initiatives.

19      16.    Good Feet's sales and marketing practices are deceptive, having the
20  capacity and tendency to mislead reasonable consumers into believing  use of  Good
21  Feet orthotics (1) will cure, treat, and/or correct ailments identified as the source of a
22  consumers pain and discomfort, (2) are personalized and customized to a customer's
23  particular requirements, and (3) are evaluated, fitted, and customized by trained in
24  store representatives that have specialized training beyond simply the Good Feet
25  product line.

17.     Good Feet advertises and markets its orthotic inserts as unique and/or specialized devices that address the root cause of symptoms which are expressed as pain, discomfort, and torment to consumers. Throughout its marketing material Good Feet repeatedly represents that its orthotics are capable of relieving chronic pain and discomfort through corrective measures. Visitors to Good Feet's website are greeted with a pop-up inviting them to, **"Stop the Pain That's Stopping You."** Good Feet also distributes video testimonials which tout the curative and pain-relieving properties of the Good Feet orthotics sold by Defendants.



**Some live with chronic debilitating pain.** The severity of their pain has significantly limited their mobility, lowering their overall quality of life.

**For others, the pain and discomfort is not as frequent or intense – but it's always there, lurking in the background.** Participating in the activities they enjoy aggravates their situation, and as a result they are forced to restrict or eliminate them.

▶ Watch Dave's Good Feet Story

▶ Watch Sabrina's Good Feet Story

18.     In fact, Good Feet fails to suitably disclose that a significant number of its customers realize no benefits from the use of Defendants' orthotic system while others are harmed by the use of Good Feet products. Good Feet targets sufferers of pain and discomfort but it fails to warn consumers that they should cease use of the products should it increase their pain or discomfort. Good Feet is aware of numerous reports received from consumers stating the orthotics may, or have, worsened their conditions but, rather than disclose or relay this information, Good Feet would have them believe its orthotics act as a magical panacea.

19.     Defendants represent to prospective customers that, **"You're under absolutely no obligation. Our focus is on making sure you are precisely fit, and**

**letting you try the arch supports for yourself."** Good Feet's representations are false and/or misleading as Defendant creates the impression that a thirty-minute test walk will allow a customer to sufficiently evaluate the efficacy of the orthotic system. Good Feet trains its salespersons to recommend an orthotic as suitable for a customer's needs based on impressions gained by walking about the store for thirty minutes or less. However, as Good Feet maintains that its orthotics stretch muscles, tendons, and ligaments, the suitability of the product can rarely be determined by thirty minutes of wearing the orthotic in the presence of Defendants' "Arch Support Expert." The products, in fact, should not be recommended without a medical understanding of the customer's particular source of pain or discomfort. Indeed, when customers subsequently complain about the inefficacy of the orthotic, Good Feet tells them that wearing the system for several weeks is at least necessary before the body can apparently be re-aligned or re-adjusted by the orthotic. That is, a salesperson cannot at an early stage possibly recommend the correct orthotic or even determine if any orthotic would be helpful.

20.    Extraordinarily, when customers discover that the product has no effect on their pain or discomfort, or negatively affects their pain or discomfort Good Feet refuses to refund the purchase price but instead allows only exchanges for another Good Feet product. Good Feet will occasionally authorize a partial refund (one half) of a sale provided the customer signs a non-disclosure agreement and a release of claims. This practice silences critics and limits the flow of adverse information which would allow consumers to make informed choices.

21.    The terms **"Personalized Fit"** and **"Custom Fit for Comfort"** are repeatedly used by Defendants to create the impression that its orthotics are unique to the wearer when, in fact, Defendants apparently mean that a consumer will receive personal attention from a salesperson. To buttress this impression, Good Feet employs phrases like "No Two Feet Are Alike," "We never take a generic, one-size-fits all approach at The Good Feet Store," and "You (and your feet) are one of a kind." Good

Feet signage displayed at each franchise location also states, "Custom Fit for Comfort." These representations are deceiving because Good Feet does not offer custom orthotics. Each orthotic recommended by an 'Arch Support Specialist' is one of but a few varieties of off-the-shelf shoe inserts that Good Feet offers. Good Feet has adapted a few-sizes fit all approach. The "Personalized Fitting" that Good Feet features on its website is not qualitatively different from visiting a mall shoe store.

22.    Defendants' marketing material repeatedly mentions that Good Feet maintains over 300 models and sizes of its product. Perhaps literally true, Good Feet actually has less than 24 distinct models multiplied by the available sizes of each model. Because the models are one part of a three-piece orthotic system, customers actually have far fewer distinct options of orthotic from which to choose. Good Feet creates this misleading impression (i.e. of a multitude of custom options) when Good Feet arrives at the over 300 number by multiplying the individual number of orthotics by available sizes.

23.    Good Feet describes its salespersons as "Arch Support Specialists." This descriptor creates a mental affiliation with medical specialists or some comparable professional. Good Feet reinforces this impression by decorating its stores with anatomical models of the human skeletal system and like materials.  Defendants then claim, "It takes an arch support expert who is intimately familiar with our broad product line of over 300 models and sizes to fit you properly." Good Feet's use of the term expert misleads consumers into believing that their salespersons are highly trained in areas relating to foot pain, discomfort, anatomy, or podiatry.

24.    Good Feet further represents elsewhere on its webpage that its orthotics are, "[d]esigned to exercise and strengthen the muscles, tendons, and ligaments of the feet – repositioning them to their optimal position. These arch supports help to alleviate foot pain, and improve balance and skeletal alignment."[5] However, Good

---

[5] https://www.goodfeet.com/products/arch-supports

Feet training focuses little (if any) attention on the science of arch support use and instead focuses its training on sales tactics. While Good Feet mandates that a store's owner and manager undergo an "Initial Brand Standard Training Program," it does not require standardized training of any of its salespersons. In fact, even the training required of franchise managers is perfunctory at best with featured topics including "Closing the Sale," "Overcoming Objections," and "Advanced Sales Techniques." Though manager training does touch on anatomy and/or biomechanics, it is presented in a single 3.5 hour session shared with topics such as the "Welcome & Facility Tour" and "Presenting without Diagnosing." Such exposure is cursory at best.

25.    **"Absolutely no obligation."** Good Feet markets the fitting experience as personalized and represents that there is "absolutely no obligation." Good Feet also tells consumers that "You'll be personally fit and then you'll get to try them out." What Good Feet means is that a salesperson will size the customer's foot and then allow them to walk around the store while wearing the arch support. However, as Good Feet acknowledges elsewhere, the orthotics require an adjustment period of at least two weeks before customers will know whether the system works for them or not. Good Feet thus creates the misleading impression that consumers will be afforded adequate time to determine the product's suitability before committing to the product. In reality, once consumers are persuaded to purchase the product, Good Feet will not refund the purchase price and instead only offers exchanges. When customers complain vocally enough, Good Feet may then offer to refund only half the purchase price in exchange for a non-disclosure agreement and waiver of claims. In this way, Good Feet unfairly and deceptively induces customers to purchase a non-refundable product which they can only later affirm has little to no value and may actually be harmful.

### B. Good Feet is Engaged in the Unauthorized Practice of Medicine

26.    Good Feet is engaged in the unlicensed and unauthorized practice of medicine by offering to treat pain and discomfort by application of an orthotic device

featured as correcting the wearer's musculoskeletal system. Such representations, offerings, and undertakings violate North Carolina's General Statute Chapter 90 Article 1.1(5) and California's Business and Professional Code section 2052(b) and (c). Violations of both laws serve as predicates for violations of North Carolina's UDTPA and California's UCL

27.    North Carolina' General Statute Article 90-1.1 prohibits engagement in the practice of medicine. Article 90-1.1(5) expressly prohibits a unlicensed person from,

> "[o]ffering or undertaking to prevent or diagnose, correct, prescribe for, administer to, or treat in any manner or by any means, methods, or devices any disease. Illness, pain, wound, fracture, infirmity, defect, or abnormal physical or mental condition of any individual…"

Similarly, California's Business and Professional Code section 2052 prohibits, "practicing, any system or mode of treating the sick or afflicted in this state, or [] diagnos[ing], treat[ing], operat[ing] for, or prescribe[ing] for any ailment,



blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person." Good Feet violates these prohibitions by offering to treat a consumer's foot related pain or extreme discomfort with

orthotics which it claims will help "correct poor biomechanics" thereby relieving pain through the corrective use of an orthotic device.

28.    Good Feet emphasizes that its products will prevent, correct, and treat medical conditions in promotional materials by highlighting representations such as "Knee, Hip, and Back Pain No More." Targeted people are those desperate for relief from pain and discomfort. By way of example, a Good Feet representative "Beth," describes helping a man who had been suffering from plantar fasciitis saying, "I helped relieve a problem that's plagued him for thirty years."

29.    Good Feet similarly represents that its products correct and treat consumers' pain and the conditions which cause it by inviting consumers to "Watch real people share their Good Feet stories about how they no longer suffer with knee, hip, and back pain."



Watch real people share their Good Feet stories about how they no longer suffer with knee, hip, and back pain



Watch real people's search for a pain relief solution in these Good Feet stories

30.    **"Pain Relief Solutions"** Good Feet features a tab at the top of its website titled, "Pain Relief Solutions." Under this tab a visitor to the website is invited to select subsections titled, "Foot Pain," "Heel Pain," "Ankle Pain," "Knee Pain," Leg Pain," "Hip Pain," and "Back Pain." When a user selects any of these subsections they are presented a page on that topic and each page contains a sub-section titled "Our Pain Relief Solutions," which contains a representation that Good Feet orthotics will alleviate a particular ailment.

31.    Good Feet offers and undertakes the activity of correcting, preventing, and treating pain by means of an orthotic device, an activity defined by law as the unlicensed and unauthorized practice of medicine.

32.    Good Feet masks and occludes disclaimers which contradict Defendants' representations regarding the salutary properties of its orthotics in fine print. Only in the Frequently Asked Questions section of Defendants' website, under the heading, "Does insurance cover arch supports? Can I use my HFSA plan towards a purchase of arch supports?"[6] does Good Feet belatedly state, "The Good Feet Store is not a medical provider. Good Feet Stores do not diagnose, prescribe, fill prescriptions, or accept or process insurance claims." Good Feet also issues a fine print disclaimer, silent and lasting roughly four seconds, near the very end of its promotional videos stating "Good Feet is not a medical provider and its representatives are not authorized to diagnose or give medical advice with respect to any physical condition." The disclaimers,  apart from being incorrect, reflect Good Feet's manufactured ambivalence when it suits their desire to equate Good Feet orthotics with a  cure for poor biomechanics[7], for "relieving joint pressure, pain, and discomfort[8]," or, that they are "[d]esigned to strengthen the muscles, tendons, and ligaments of the feet[9]."

33.    Good Feet's medical practices include marketing its orthotics as products capable of relieving chronic pain resulting from medical conditions by correcting the body's biomechanics through use of its orthotic devices. This intrusion into areas which are the purview of licensed medical practitioners is proscribed by the North Carolina General Statute Chapter 90-1.1 and California's Business and Professional Code section 2052.

---

[6] https://www.goodfeet.com/about-us/faq

[7] https://www.goodfeet.com/how-arch-supports-help

[8] https://www.goodfeet.com/how-arch-supports-help

[9] https://www.goodfeet.com/products/arch-supports

34.     Good Feet's statements and representations lead a reasonable person to believe that Good Feet orthotics will correct the musculoskeletal structure of the body and thereby relieve pain. Good Feet outright claims that its users "no longer suffer from knee, hip, or back pain," and that its "arch supports are designed to keep your feet in the ideal position, thereby relieving pain and discomfort." Good Feet even uses medical symbols and anatomical representations on its website to cement in consumers the association between Good Feet and health care, an impression Good Feet further incubates through its salespersons who it gratuitously labels "arch-support specialists".[10]

35.     Good Feet's practices as described herein are Unfair and Misleading and violate North Carolina and California's prohibition of the unlicensed practice of medicine. Such violations of the respective state statutes further demonstrate that Good Feet's practices are immoral, deceptive, unethical, oppressive, unscrupulous, and injurious to consumers and unfairly disadvantage honest competitors.

## **CLASS ACTION ALLEGATIONS**

36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Classes of persons:

**Nationwide Class**:        All persons in the United States who, within four (4) years past of the filing of this Complaint, purchased Good Feet orthotics and relied on Good Feet's marketing representations which emanated from the state of California and Defendants' practices of affirming the same to members of the class.

**North Carolina Sub-Class**:     All persons who purchased Good Feet orthotics in North Carolina within at least four (4) years of the filing of this Complaint in and relied on Good Feet's sales and marketing representations, as elaborated herein.

---

[10] https://www.carecredit.com/about/

37.    Excluded from the Class definitions are all legal entities, and any person, firm, trust, corporation, or other entity related to or affiliated with Defendants, as well as any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

38.    While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and thereon believes that there are thousands of members in the proposed Class.  The number of individuals who comprise the Class is so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action will benefit both the parties and the courts.

39.    Plaintiff's claims are typical of the claims of the other members of the Class. All members of the Class have been and/or continue to be similarly affected by Defendant's wrongful conduct as complained of herein, in violation of North Carolina and California law.  Plaintiff is unaware of any interests that conflict with or are antagonistic to the interests of the Class.

40.    Plaintiff will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in consumer class action lawsuits and complex litigation. Plaintiff and her counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff is aware of her duties and responsibilities to the Class.

41.    Defendants have acted with respect to the Class in a manner generally applicable to each Class member. Common questions of law and fact exist as to all Class members and predominate over any questions wholly affecting individual Class members. There is a well-defined community of interest in the questions of law and fact involved in the action, which affect all Class members. Among the questions of law and fact common to the Class are, *inter alia*:

(a)    Whether Defendants' marketing practices satisfy standards establishing unfair and/or deceptive sales practices and/or parallel legal requirements in

violation of North Carolina's UDTPA and/or California's UCL including, *inter alia*;

(b)     Whether Defendants' practices have the, likelihood,  the capacity of  or tendency to deceive;

(c)     Whether Defendants' practices are in or affecting commerce;

(d)     Whether Defendants' practices violate the public policy of the states of North Carolina and/or California;

(e)     Whether Defendants' marketing and sale of its orthotics is immoral, deceptive, unethical, oppressive, unscrupulous and/or otherwise injurious to consumers;

(f)     Whether Defendants' are engaged in the unlawful, unlicensed practice of medicine as defined by California's Business and Professional Code section 2052 sections (b) and (c) and/or North Carolina General Statute Chapter 90-1.1, *et seq*.;

(g)     Whether Defendants' sales and marketing of its orthotics in the manner and context alleged constitute an "unfair", legal and/or injurious business practice;

(h)     Whether Defendants' sales and marketing practices cause consumer's substantial injury, whether those injuries are reasonably avoidable by consumers, and whether Defendants' practices are outweighed by any countervailing benefits to consumers or competition;

(h)     The proper standard extent of damages, restitution. equitable remedies, and declaratory and/or injunctive relief to which Plaintiff and the Class are entitled; and

(i)     Whether Plaintiff and the Class should be awarded attorneys' fees and the costs of suit.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

43.    Defendants have acted on grounds generally applicable to the entire Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## **FIRST COUNT**
### **Violation of N.C. Gen. Stat. § 75-1.1**
### **Unfair and Deceptive Unfair Trade Practices Act**
### **(On Behalf of the North Carolina Sub-Class)**

44.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

45.    Plaintiff Sisk and the putative class are consumers within the aegis of N.C. Gen. Stat. § 75-1.1.

46.    Defendants' marketing and sales practices are in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

47.    Defendants' unfair and deceptive commercial practices directly and substantially injured Plaintiff because she would not have purchased Good Feet orthotics had she known the true nature of the products more fully described above, including the fact that Good Feet orthotics are neither capable of nor intended to cure, correct, or diagnose the ailments she and other consumers sought to remedy. Plaintiff suffered direct economic harm and continues to suffer from such harm by virtue of the 26.99% interest rate on CareCredit purchases.

48.    None of Good Feet's unfair or deceptive practices were reasonably avoidable by Plaintiff or putative class members, nor do they provide any aggregate benefit to consumers, competitors, or the market in general.

49.    Plaintiff Sisk and North Carolina Sub-Class members who purchased Defendant's orthotics had no way of reasonably knowing that these products were deceptively marketed, advertised, packaged, and labelled. Thus, North Carolina Sub-Class members could not have reasonably avoided the injury they suffered.

50.    The gravity of the harm suffered by Plaintiff Sisk and North Carolina Sub-Class members who purchased Defendants' orthotics outweighs any legitimate justification, motive or reason for unfair and deceptive marketing practices. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policy as set out by the North Carolina legislature and is substantially injurious to Plaintiff Sisk and members of the North Carolina Sub-Class.

51.    The above acts of Defendant, in disseminating said misleading and deceptive statements throughout the State of North Carolina to consumers, including Plaintiff Sisk and members of the North Carolina Sub-Class, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's orthotics, and thus were violations of N.C. Gen. Stat. § 75-1.1.

52.    These misleading and deceptive practices caused Plaintiff Sisk and other members of the North Carolina Class to purchase Defendants' orthotics and/or pay more than they would have otherwise had they known the true nature of the orthotics. Had Plaintiff and other members of the Class known the true nature of the orthotics, they would not have purchased these products.

53.    As a result of Defendants' above unlawful, unfair and fraudulent acts and practices, Plaintiff Sisk, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public of the state of North Carolina, seeks injunctive relief prohibiting Defendants from continuing these wrongful practices, and such other equitable relief, including full restitution and disgorgement of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

## SECOND COUNT

### Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* -

### Fraudulent Business Acts and Practices

### (On Behalf of the Nationwide Class and the North Carolina Sub-class)

54.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

55.     Such acts of Defendants as described above constitute fraudulent business practices under Cal. Bus. & Prof. Code §§ 17200, *et seq*.

56.     As more fully described above, Defendants misleadingly market, advertise, package, and label its orthotics as custom fitted by experts when in fact their orthotics are neither customized to the wearer nor are they fitted by experts or specialists. Defendants' misleading marketing, advertisements, packaging, and labeling originates, and is disseminated, from California and is likely to, and does, deceive reasonable consumers. Indeed, Plaintiff Sisk and other members of the Class were unquestionably deceived about the curative benefits of Defendants products and the extent to which they are suitable for her and the class member's needs. Because Defendants' marketing, advertising, packaging, and labeling of its orthotics misrepresents and/or omits the true nature of the orthotics benefits such acts are fraudulent, deceptive, and unfair business practices and acts.

57.     Defendants' further violate California's UCL by engaging in the unlicensed practice of medicine which is prohibited by both the laws of the state of California and of the state of North Carolina.

58.     Defendants' misleading and deceptive practices caused Plaintiff Sisk and other members of the Class to purchase Defendants' orthotics and/or pay more than they would have otherwise had they known the true nature and limitations of Defendants' mass-produced, off-the-shelf shoe inserts.

59.     Because of Defendants' deceptive acts and practices the injuries suffered by consumers were not reasonably avoidable and the gravity of the harm suffered by

Plaintiff Sisk and Nationwide Class members who purchased Defendants' orthotics outweighs any legitimate justification, motive or reason for unfair and deceptive marketing practices. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policy as set out by the California legislature and is substantially injurious to Plaintiff Sisk and members of the Nationwide Class.

60.     As a result of Defendants' above unlawful, unfair, and fraudulent acts and practices, Plaintiff Sisk, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and other such equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for relief and judgment as follows:

A.     For an order declaring that this action is properly maintained as a class action and appointing Plaintiff as representatives for the Class, and appointing Plaintiffs' counsel as Class counsel;

B.     that Defendant bear the cost of any notice sent to the Class;

C.     For an order awarding Plaintiff and the members of the Class actual damages, treble damages, restitution and/or disgorgement;

D.     For an order enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

E.     For restitution of the funds which were unjustly enriched by Defendant, at the expense of the Plaintiff and Class Members.

F.     For an order awarding Plaintiff and the members of the Class pre- and post-judgment interest;

1    G.    For an order awarding attorneys' fees and costs of suit, including experts'

2    witness fees as permitted by law; and

3    H.    Such other and further relief as this Court may deem just and proper.

4

5    **<u>JURY TRIAL DEMAND</u>**

6    Plaintiff demands a trial by jury for all of the claims asserted in this Complaint

7    so triable.

8

9    Respectfully submitted,

10

11    October 30, 2019                    FINKELSTEIN & KRINSK LLP

12

13                                        By: /s/ John J. Nelson
                                              John J. Nelson, Esq.

14

15                                        Jeffrey R. Krinsk, Esq.
                                          John J. Nelson, Esq.
16                                        Attorneys for Plaintiff and the putative class

17

18

19

20

21

22

23

24

25

26

27

28